Case number 154136 Kevin Darrah v. Dr. Krisher et al. Oral argument not to exceed 15 minutes per side. Ms. Dorianne Mason for the appellant. You may proceed. Good morning. I would like to reserve three minutes for rebuttal. You may. The district court erred in granting summary judgment in a case where Mr. Darrah received no medication whatsoever for three months and then was prescribed a medication that was not only counter-indicated but also demonstrably harmful to Mr. Darrah. Appellees took away the only treatment that had worked for him both inside and outside of prison. And Mr. Darrah went from stable to suffering. In the first six weeks of receiving no medication, Mr. Darrah began to have buildup on his feet, pain, and open fissures. And in turn, an increased risk of infection. He was the same man with the same serious medical need, but upon entering Madison Correctional Institution, received either no medication at all or medication that made his serious medical condition worse. When you look at the defendants, though, their level of culpability was not the same, correct? Because you had the one doctor, I guess Dr. maybe Chrysler, who did write the order for the serotonin that he needed, but it was not filled. So where a person is writing the prescription for the medication and is actually trying to get it, how can you say that that was deficient under the standard of providing no or inadequate medical care? Your Honor, yes, you're correct that each defendant has a different level of culpability, but they are all culpable. Dr. Weil was the prescribable or prescribing physician, and he reviewed the medical intake information that Mr. Darrah came to Madison Correctional Institution with, knew of the diagnosis, knew that he was on medication, and did not prescribe the psoriasis. What he did was he made an order but did not actually verify that the prior authorization was actually present, and because of this, it resulted in Mr. Darrah not receiving his medication for a period of three months. Isn't that really negligence? I mean, as I understand the facts, and correct me, he couldn't just get sorreatine right then because the second prison was under a different regime than the first prison. Your Honor. So the fact that he didn't write it on day one, it wouldn't have been effective if he did, so he tried to see what was going on. Your Honor, that is actually a genuine issue of material fact. We have deposition testimony that states that there is an opportunity for nonformulary medications to be prescribed through an outside pharmacy, and that was testimony from Dr. Eddy. E-D-D-Y, Eddy? E-D-D-Y, yes, Your Honor. What, he said that you could have written a prescription and just sent it out to CVS, and the state would have paid for it? Your Honor, yes, that there was an opportunity to provide nonformulary medication through outside pharmacies. And also within ODRC's actual policies, there is an opportunity for the continuation of medication that is nonformulary when someone comes into the new facility. So there is evidence that supports the finding that there was an opportunity for Dr. Weil to provide that medication. So then in April, as I understand, he comes in January, and April Weil does write a request for sorreatine, and I suppose per procedures that goes up to Krischer and Krischer denies it. So are you saying that he should have at that point written something else to somebody else even though Krischer denied it? Your Honor, no. The culpability that defendant or Dr. Weil has starts at the intake of Mr. Dara. I understand that, but obviously then does that culpability end with this writing? Because your other theory was that Weil could have still at any time gotten it from the outside. So should he have done that when Krischer denied his request? Your Honor, when Dr. Weil went through the process of getting prior authorization, at that point, that's a second portion of his culpability. At that point, we can move forward with the consideration of methotrexate, and Dr. Weil, as the physician who saw Mr. Dara often, was knowledgeable about the fact that methotrexate was not only not working, but it was putting Mr. Dara in a worse off position than had he had no medication whatsoever. What made it worse off? I thought it just didn't help him. What's your basis for saying worse off? Your Honor, worse off meaning that without any prescription medication, Mr. Dara's HPK would crack open his skin and eventually it would heal itself. But because methotrexate is an immunosuppressant, what it did was cause the fissures to remain open. So they would heal a little bit and then crack back open. So had he no medication whatsoever, the open fissures would remain and then heal. But because he was on methotrexate, they remained open and painful and put him at a risk of infection for 10 months. Okay, and I want to ask you about Dr. Christian, whom I kind of got confused about earlier. He denied the prior authorization request for Soriatine. Is there anything in the record that shows that he, at that time, knew that the methotrexate was not an equivalent drug that could have the same effects as the Soriatine? Is there any? Because if there's nothing to show that he knew that and he's prescribing what he believes is an equivalent medication, wouldn't that just be negligence and wouldn't that defeat your claim against him? Your Honor, no. My apologies, Dr. Christian was aware of methotrexate's label, which states that methotrexate is the medication of last resort, meaning no other medication or treatment has proven successful, then you are able to use methotrexate. Because of its higher level of toxicity, it's actually not, it's counter-indicated because it's not used for chronic conditions. And Mr. Dare had a chronic condition that methotrexate was improper and inappropriate for. You said that the cost was the sole factor in them not providing the Soriatine that he needed. Your Honor, we submit that there is evidence enough to support a reasonable juror to find that cost was the exclusive reason. And we know that because when cost was taken out of consideration and Mr. Dare and his wife agreed to pay for it, then we saw that Soriatine was in fact provided to him. What about Nurse Stanforth? What did she do wrong that you think amounts to deliberate indifference? Ms. Stanforth was the health care administrator who was in charge of ensuring that medical treatment was provided to inmates at Madison Correctional Institution. Three times in March, once in April, once in June, four times in July, once in September, once in October, and once in November, Ms. Stanforth was made aware that methotrexate was not working, that Mr. Dare was continuing to have pain, open fissures, and was at risk for an infection. So consistently throughout the entire period that we're discussing, Ms. Stanforth was made aware and did not take the steps that she should have in order to ensure that Mr. Dare received appropriate medication. She had no authority to prescribe, so what steps did she not take that you claim she should have taken? Yes, Your Honor, Ms. Stanforth did not have the ability to prescribe, but what power she did have was to ensure that appointments were made with the appropriate medical professionals and that the medication process going through the prior authorization process was complied with. You're saying she didn't do that? Your Honor, that's precisely what I'm saying. I mean, all these different doctors saw him quite frequently, though, didn't they? It wasn't like she said, you know, come back in three months. The doctors saw him, did he not? Pretty regularly. Yes, Mr. Dare did have appointments with both Dr. Weil and their specialist, who is a podiatrist, but the resulting action did not support an actual treatment. Mr. Dare came in with medications that was working, and if this were someone who was a diabetic and they came in with a medication and then didn't receive medication for three months. Didn't come in with it in the sense of a physical supply. Yes. That's why he had been getting a certain document, and I didn't see that Nurse Stanforth, there wasn't, you know, she didn't submit a request or she didn't, you know, check off a box or send a check to pay for it. Is that Weil and Krischer were doing or not doing? Was there something the doctors told her to do that she didn't do? No, Your Honor, there was not something that the doctors instructed her to do. Ms. Stanforth is an independent health care administrator who facilitates medical treatment, and so what she could do was make sure that Mr. Dare had additional appointments when he was making complaints of pain and the methotrexate not working. She could have ensured that the prior authorization request was submitted in a more timely manner, and she could have ensured that the follow-up to a prior authorization request would have had to be, in fact, done by one of these doctors. So you're saying she didn't nudge them enough. Precisely, and we do have documents that support that this was a part of her role. In e-mails, she discussed the more expensive drugs, seriatine. She discussed the fact that Mrs. Dare, the inmate's wife, had complained to her that it was not working. She saw informal complaints and grievances that Mr. Dare had filed. She knew that it was not working and did not take the steps necessary. If she had no control over these doctors and this information in the record that she saw and that she noted, that would have been also available to the docs, would it not? Your Honor, yes, some of that information was available to the doctors, and they had evidence that methotrexate was not working from month one, month two, month three, month four, month five, six, seven, and did not change the treatment of Mr. Dare's. Oh, my apologies, I've finished with my time. Any other questions? Thank you. You'll have your time for rebuttal. Thank you, Your Honors. May I approach? Yes, you may. Thank you. May it please the Court, Deborah Gurel-Werle on behalf of Dr. Wiles, Dr. Kersher, Dr. Eddy, as well as a nurse Stanforth. This is a situation which is as far removed from deliberate indifference as I've ever seen. These doctors, all of them combined, went beyond what they were even supposed to do in this situation, what they were really, under policy and procedure, required to do to obtain medication that this gentleman, that this inmate, wanted. It started out in 2006 when he was supposed to provide medication that addressed his medical needs. Yes, Your Honor. But they didn't do that. But they did do that, Your Honor. Well, it didn't work, and he kept telling them the medication that worked, he had gone through this, he had a condition, and just going through the motions, because that's what you're supposed to do, that's not sufficient. Your Honor, it wasn't until March 19, 2011, as acknowledged by the District Court, was the first time in the actual record, I mean, I see his declaration, which is a lot different than the actual medical record. March 19, 2011, was the first time Mr. Dare made any complaint of pain, and that's when he filed an informal complaint. This was the fourth time that he had made a complaint about not receiving soratane. But prior to that, there wasn't any complaints of pain, per the medical record, which even the plaintiff. So that's March 19. Now, when did he get it, finally? He ultimately, that was the first time he got, or that was the first complaint of pain he ever had. And he's also, at that point, complaining of open wounds. He didn't get soratane until sometime in February. He says in March, sometime in March. Next year. Yes. He didn't get soratane. But he told Dr. Kirscher, or Dr. Weil, his doctor, that he had prior approval. He had already received prior approval while at Lorain. That was untrue. And the record reflects that Mr. Dare knew that he didn't get prior approval for soratane. And what's really significant. Wait a minute now. Yes, Your Honor. He knew that he didn't get prior approval, but at the other facility, he got the soratane, correct?  But for a layperson, if they got the soratane, what makes you say that that means he knew he didn't get prior approval? Because if you go through, especially the report and recommendation as adopted by the district court, and then later basically assumed in Judge Smith's second ruling as far as Nurse Stanford is concerned, is that when he came and was complaining about not getting soratane, he told Dr. Weil, he said, Dr. Weil said, the patient is under the impression that the most recent prior approval is still in effect. So Plaintiff Dare knew that he knew this was a non-formulary medication. And when he was first received into ODRC, he was informed, when he first came into the sex offender program at Madison, and he was asking for soratane, they said, that's a non-formulary medication. You'll have to get approval for that. That's all reflected in the briefing as well as the records. He comes and he tells Dr. Weil that he's got this prior approval. So that's why Dr. Weil is... So an individual who's in the custody of the correctional system, how do they go about getting approval? Because they can't go out on their own and do this. That's within the custody and control of the institution where they're confined. Absolutely. So there has to be some responsibility on the part of those who have custody of the physical person of Mr. Dare. And that's what Dr. Weil, exactly what he did. When he's hearing that he had prior approval, he said, hey, get this prior approval so I can keep ordering this medication. And in fact, if you look at the medical... He told who to get that prior approval. He wrote it as an order for the nursing personnel, go get that prior approval that this patient says he has. And in the same time, believing that it was in effect, he's writing orders for sorotain. There was three months that could have been negated by Mr. Dare simply saying, you know, I don't know anything about prior approval. All I know is I got sorotained. You know, I go back to what I said. The people who had the best ability to determine whether or not prior approval existed after he raised that were the people in control of that facility. The person in the least position to affect that was Mr. Dare, the detained inmate or whatever. So, you know, the fact that he said it, that he believed he had it and he didn't have it, I don't think that relieves the institution of their obligation and responsibility to take care of the medical needs of that individual in their custody and control. And they did that, Your Honor. They saw him. They provided pain medication. They gave him a lay-in, and that's another important... That's just treating the symptoms. That's not curing the... They knew that sorotain was the one medication he had gotten at the Lebanon Correctional Institution, right, and that the dermatologist there had determined that multiple other treatments had proven ineffective. So Dr. Wild, Dr. Krischer, Dr. Eddy all would have known that because it was in the records. And yet they didn't provide him the one medication they knew worked for a fairly serious medical condition, this HPK, right? And I agree with that, Judge Gilman, except for one thing. When you just said the word knew, they didn't know what worked, methotrexate, which was the formulary medication, as well as versus the sorotain. And plaintiff's counsel has just indicated that somehow that methotrexate has been determined to be a least effective and damaging drug. There is no evidence of that. In fact, the only evidence in this record is that methotrexate is the preferable medication. Okay. Let me stop you for a second and just remind you of what you just told us. On the one hand, you're telling us that we can, you, the people there, could rely on this inmate who said, I've got prior authorization for this substance, and we can rely on that, we can believe that. But when this person comes back and tells us sorotain is the thing that works, we can't rely on that because we don't know. You know, if he's a reliable reporter with respect to the prior authorization, why is he not a reliable reporter when he talks about what works in his situation? Your Honor, you can't just rely on what's convenient for you. And the fact of the matter is that he did not get this medication until he and his wife agreed to pay for it. That's, may I, may I? You may. First of all, I'm not saying that we should be able to rely on him. But what I'm saying is whether or not, whether, these doctors are stuck. The only person that's going to put out the sorotain is the Ohio Department of Mental Health. And this system was created for this very reason. So doctors couldn't order this medication and obtain this medication. Plans Council told this court that all they had to do, there was two other options. If it was denied by the medical director or the director of the Bureau of Mental Health, you just simply write a prescription and CVS can fill it. That is completely inaccurate, and that's why this system is devised the way it is. There has to be, even if, even if he came and said, hey, all I know is I got sorotained before, there's nothing these doctors could do but to please ask for sorotained, have it denied, because Dr. Kersher was stuck, even as the medical director. He says you're going to have to try a formulary medication first. If there's a complaint about methotrexate versus sorotain, that's an issue that none of these individuals, these currently named defendants, can have any control over. You would have to bring in the Ohio Department of Mental Health. Dr. Eddy could have certainly done it. No, no, not without trying the methotrexate first. Whether he did it right in January, right in January, he said, hey, because Dr. Kersher, he sees the transfer summary coming on, he sees that he's taken sorotain. Dr. Weill does, I'm sorry. And he says, and he writes a prescription right then for sorotain, believing that he was already receiving it correctly. Was that prescription in the record? Yes. He wrote the order. The prescription is it. But the problem was. I saw the document where Kersher denied it in April. Do you have the citation for the January document? I mean, I can look it up, but I had not seen it myself previously. If I may, Your Honor. Well, let's pass that. It's in my brief. Let's pass that for a moment, which is what really happened, correct me if I'm wrong, is that Lebanon was on a different system. So that when Daris said he had prior authorization, what he really meant was he was getting it, because Lebanon, I guess for whatever reason, didn't have these restrictions, these bureaucratic restrictions that then the second facility did. Is that pretty much right? Lebanon was not centrally controlled. They still had a pharmacy inside that could obtain medications. There was this whole movement to centrally control the disbursement of medications. There's a certain amount of medications. Well, it wasn't that these doctors were deliberately indifferent. It was kind of that the system was deliberately indifferent. The doctors prior to that that were issuing non-formulary medications, not deliberately indifferent, but maybe inappropriate, in contrary ODR site policy before trying formulary medication. So they have to try the formulary medication. Are you saying Lebanon really did something wrong? It's just that they were physically able to do it when Madison couldn't get around it? Exactly. They could get around it. I'll go as far as saying Lebanon could get around it, but Madison could not. But didn't Lebanon try the methotrexate? No, ma'am. They tried other medications before. When he first came into the Corrections Receiving Center, he was informed because he was asking for Soratane then. He was asking for Soratane then, and they said that's a non-formulary medication. We're going to try something that's called Devonox, I think, and that's also in my brief. They said you're going to have to try that for at least 30 days first. Well, 13 days into that, he was doctor shopping. He asked a different doctor about getting Soratane. Do medical records from Lebanon come to the facility that he ultimately ended up in? Medical records, Your Honor, commonly just follow them wherever they go until they're released. So, you know, Devonox. So this new facility should have had the record showing the treatment protocol from Lebanon. But you have to remember that was in 2006. Oh, yes. But the regimen had changed from 2006 until 2011. This whole centralization started somewhere in 2011. And, in fact, just to let you know, if he had stayed in Lebanon and had not moved, once Lebanon became centrally located or centrally controlled shortly thereafter his transfer, he would have had to go back and he would have been taken off the Soratane and would have had to try the methotrexate to see if it was effective because it was a formulary medication. They wouldn't have allowed him. They found out soon enough that the methotrexate was not effective, right, in treating his condition. How long would he have had to stay on it? A year? I mean, here he checks in in January of one year and he doesn't finally get the Soratane until February a year later. He didn't get the methotrexate, I believe, until, like, April 17th. That's when the methotrexate, he didn't get the Soratane for a year. And I'm not sure, and that's not a part of the evidence, that's never been put a part of the evidence, so I don't want to miss the date. I don't know how long you have to be on the formulary medication to determine it to be, whether it's ineffective or not. And again, if you look at the record, I understand Mr. Dara is saying one thing, but if you look at the cold record, the medical record in this, when he first, after he first got the methotrexate in April 4th, on April, no, I'm sorry, I think it was April 11th, he picked it up along with the folic acid. He didn't have any, there was no other complaints, even though, and this is in the report and recommendation as adopted by the district court, even though he, on page of document 53, on page ID 715, he had been back into the infirmary 10 to 15, or at least 10 times after beginning the methotrexate, but yet he doesn't refer, make any reference to his HPK until June 14th, 2011. And then, and this is significant, he doesn't say he's having pain, he says that his feet are no worse but no better. He says that. And he asked to have his dose increased. He's also seen running on the track after that, which he tries to backpedal and say, well, it doesn't matter if I'm sitting down or if I'm walking, this buildup, which is like you're walking on something, it's hard callus on the bottom of your foot, he says, well, it doesn't matter if I'm standing or walking. Then why the big issue about having to have a lay-in to relieve the pressure? Anybody knows that when you stand on something, it hurts, if you're standing on something. He's running on a track, he's asking for more methotrexate, and then after that, he doesn't make, the first time he makes any complaint of pain after receiving the methotrexate is not until July 7th, 2011. And at that point, he says he's in severe pain. This multiple issues of supposedly complaining of pain and pain, that's not accurate, Your Honor, not according to the medical record. He doesn't make any complaint until July 7th, 2011 of pain, but they're confused because they see him running on the track. He still doesn't get the, even if you start July 7th, he still doesn't get the medicine for nearly another six months. The Ohio Department of Mental Health is not going to approve Soratane with these kinds of signs and symptoms that he's not complaining of pain, he's running on the track. They want to know that... Basically, you're saying that the medical evidence is ambiguous and the docs did the best they could under the circumstances and it wasn't deliberate indifference, even if it may have been a mess-up and he didn't do as well as he should. Is that kind of your basic... I would agree with most of what you said, Your Honor, in all due respect, except for the ambiguous. I don't think the medical record is ambiguous at all. It's very clear... Counsel, I think your time has expired. Thank you, Your Honor. Do you have other questions? Okay, thank you. Thank you, Your Honor. You'll have your time for rebuttal. The appellee's attorney made several statements around issues of pain, issues of the efficacy of methotrexate, issues of when Mr. Dara let them know that it was not working, and all of these things are genuine issues of material fact that should go to a jury. These are issues that there is evidence to support Mr. Dara's statements around each of these issues. Because of this, we ask for the district court's summary judgment to be reversed. Are there any additional questions from Your Honors? No, thank you. Okay, thank you. All right, that case will be submitted.